# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

RICARDO LOPEZ VALENZUELA,

                                             Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                                             Defendant.

Case No.:  16-CV-2424 W (JMA)

**ORDER:**

**(1) GRANTING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT [DOC. 12];**

**(2) DENYING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT [DOC. 13]; AND**

**(3) REMANDING CASE**

Plaintiff Ricardo Lopez Valenzuela ("Plaintiff") seeks judicial review of the determination by Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Defendant"), that he is not entitled to supplemental security income ("SSI") benefits. The parties have filed cross-motions for summary judgment. For the reasons set forth below, Plaintiff's motion for summary judgment is **GRANTED**; Defendant's cross-motion for summary judgment is **DENIED**; and this matter is **REMANDED** for further proceedings.

1

# I. BACKGROUND

Plaintiff was born on December 13, 1965. (Administrative Record ("AR") 296.) Plaintiff is from Sinaloa, Mexico and moved to the United States when he was 14 years old. (AR 504.) He attended school until eleventh grade. (AR 59-60.) Plaintiff can read, write, and speak English, but is more comfortable in Spanish. (AR 60.) Plaintiff has worked in the past as a laborer helper, floor sweeper, factory worker, and fast food cook. (AR 60-61, 68, 84.)

Plaintiff protectively filed an application for SSI benefits on April 24, 2012, alleging he had been disabled since January 1, 2012. (AR 24, 296.) Plaintiff alleged he was disabled due to chronic back pain, shoulder and neck pain, mental delay, and depression. (AR 92.) The claim was initially denied on August 24, 2012 and upon reconsideration on March 8, 2013. (AR 118-24,130-35.) Plaintiff requested an administrative hearing, which resulted in three hearings before Administrative Law Judge ("ALJ") James S. Carletti. (AR 43, 52, 57.) The first hearing, held on April 7, 2014, was continued to obtain more records, and the second, held on August 19, 2014, was continued because of interpreting difficulties. (AR 48, 54.) The third and primary hearing took place on December 1, 2014. (AR 57.) Plaintiff, medical expert Alfred G. Jonas, M.D., a psychiatrist, and vocational expert John P. Kilcher testified at the third hearing. (AR 24, 57-91.)

The ALJ issued an unfavorable decision on February 26, 2015. (AR 18-34.) Plaintiff sought review of the ALJ decision; the Appeals Council for the Social Security Administration ("SSA") denied Plaintiff's request for review on July 29, 2016, making the ALJ's decision the final decision of the Commissioner. (AR 1-8.) Plaintiff then commenced this action pursuant to 42 U.S.C. §405(g). (ECF No. 1.)

## II. SUMMARY OF RECORDS

### A. Physical Impairments

According to Plaintiff, his physical problems began in 1985 after he had a car accident for which he never received treatment. (AR 503.) The accident resulted in injury to the left side of his body; blurry, limited vision in his left eye; and daily headaches due to head trauma. (AR 440, 503.)

### 1. Dr. Cevallos, San Ysidro Health Center (Treating Physician)

Plaintiff received treatment between 2011 and 2014 from Dr. James Cevallos with San Ysidro Health Center. In May 2011, Plaintiff presented to Dr. Cevallos with respiratory problems, including shortness of breath and wheezing, and pain in the left side of his neck and left side of his ribcage. (AR 443-44.) In July 2011, Plaintiff stated he had rheumatoid arthritis in his back and requested disability. (AR 442.) In August 2011, Plaintiff complained of chronic mid-back pain without radiculopathy, for which Dr. Cevallos prescribed ibuprofen. (AR 441.) An x-ray of Plaintiff's thoracic spine showed "mild multilevel degenerative change with possible mild compression of an upper thoracic vertebral body, age-indeterminate." (AR 452.) In September 2011, Plaintiff reported continued back pain, and stated prescribed exercises made his symptoms worse. (AR 438-40.) He also complained of weakness on his left side. (AR 440.) His physical exam revealed constricted pupils, decreased range of motion in his neck with crepitus (crackling or popping sounds), and positive tenderness to palpation of his mid-upper thoracic spine. (AR 437, 440.) Dr. Cevallos referred Plaintiff to physical therapy and prescribed Vicodin. (AR 439-40.) An x-ray of Plaintiff's cervical spine indicated mild spondylosis. (AR 451.) An MRI of his thoracic spine showed a minimal disk bulge at T7-8. (AR 430.)

3

In October 2011, Plaintiff reported Vicodin helped his back pain but made him sleepy. (AR 435.) Plaintiff described his pain as "mal" and was unable to do anything at times due to his pain. (AR 434.) Dr. Cevallos referred Plaintiff to physical therapy and the pain clinic. (AR 434.) In November 2011, Plaintiff stated physical therapy had taken his pain down from a 10 to a 5, on a 1-to-10 scale. (AR 433.) He also described again having left lower rib pain. (AR 433.) An x-ray of Plaintiff's left ribs was normal. (AR 450.) Plaintiff's visit with the pain clinic did not result in any recommendations because his exam was "essentially unremarkable." (AR 430.) In December 2011, Plaintiff stated he had lung pain and shortness of breath, which he attributed to "a chronic disease in my lungs." (AR 430.) In early 2012, Plaintiff presented with complaints of depression, stress, and chronic back pain. (AR 426-28.) Dr. Cevallos prescribed Paxil (an antidepressant) and referred Plaintiff for psychiatric care. (AR 426-27.) In April 2012, Plaintiff stated he used 1 to 5 tablets of Vicodin per day. (AR 426.) Plaintiff continued to receive refills of Vicodin through 2012 and reported it brought his pain level from 10 to 5. (AR 487-89.) Plaintiff continued to receive routine checkups with Dr. Cevallos' office during 2013 and 2014. (AR 514-20, 526-31, 538-44.)

On April 4, 2014, Dr. Cevallos completed a medical source statement analyzing Plaintiff's ability to perform work-related activities on a daily basis in a full-time job setting. (AR 536-37.) Dr. Cevallos concluded Plaintiff's chronic left side body pain limited him to lifting or carrying less than ten pounds, standing or walking less than two hours in an eight hour workday, and sitting for less than one hour per day. (AR 536.) Dr. Cevallos stated Plaintiff would need to alternate sitting and standing on a "minutes to hourly" basis to relieve his symptoms. (AR 537.) He indicated Plaintiff could never perform any acts of climbing or balancing, and could only occasionally stoop, kneel, crouch, or crawl. (AR 537.) Dr. Cevallos noted Plaintiff's left-eye blindness limited his vision, and his left side pain and numbness limited his ability to reach or perform fine or

4

gross manipulation of objects. (AR 537.) Dr. Cevallos gave Plaintiff a "fair" prognosis, and opined he could not work because of his left side body pain and numbness. (AR 537.)

### 2. Vision Testing

Plaintiff had his vision tested in June 2013. (AR 521-22.) Plaintiff received a diagnosis of left eye blindness and optic atrophy in the left eye from Dr. Martin Rajsbaum of Advanced Eye Care. (AR 522.) Dr. Rajsbaum prescribed Plaintiff glasses and indicated Plaintiff's visual acuity could be corrected to 20/25 in the right eye and at best, he would be able to "count fingers" with the left eye. (AR 525.)

### 3. Sleep Study

On July 14, 2014, Plaintiff underwent a sleep study at Advanced Lung and Sleep Clinic and was diagnosed with mild obstructive sleep apnea. (AR 546-49.) Treatment recommendations included CPAP (continuous positive airway pressure) therapy, practicing good sleep hygiene, treatment of nasopharyngeal problems such as allergic rhinitis, and weight loss. (AR 548.) Plaintiff was also diagnosed with Chronic Obstructive Pulmonary Disease. (AR 549.)

### B. Mental Impairments

Plaintiff underwent a Behavioral Health intake assessment at San Ysidro Health Center on November 18, 2011. (AR 503-06.) The intake notes reflect Plaintiff has "low interest in doing things, feels depressed, can't sleep, can't concentrate and moves very slowly." (AR 503.) Plaintiff reported "he has memory loss everyday [and] feels anxious and unable to relax." (AR 503.) He also stated he had no family history of mental illness, had never been hospitalized for mental health problems, and had never been prescribed psychotropic medications. (AR 503.) Plaintiff denied suicidal or homicidal ideation. (AR

5

503.) He stated he was living in a tent in someone's backyard, and that he no longer worked. (AR 504.) He reported having held small side jobs for the past twenty years, but had been unable to retain them due to his physical condition. (AR 504.) The intake assessment notes, "Client is displaying symptoms of depression and anxiety due to a car accident that has caused some medical conditions. He feels hopeless as he is unable to work and has problems making social connections." (AR 504.) Plaintiff's treatment plan included attending therapy, exploring activities he enjoyed, and increasing his social skills. (AR 505.) Plaintiff was observed as being expressionless and having a decreased amount of motor activity, slowed speech, flat affect, depressed mood, ideas of worthlessness, poor recent memory, below normal intellect, and poor insight. (AR 506.)

### 1. Dr. Fajerman, San Ysidro Health Center (Treating Psychiatrist)

Plaintiff started seeing Leon Fajerman, M.D., psychiatrist with San Ysidro Health Center, on February 1, 2012. (AR 509.) Dr. Fajerman reported Plaintiff exhibited mildly increased motor activity; peculiar posturing; repetitive acts; blunted, inappropriate affect; mild depressed and anxious mood; moderate poverty of content of thought; severe somatic complaints; moderate inability to concentrate; poor remote memory; poor insight and judgment; and unrealistic views of his illness. (AR 511.) Dr. Fajerman indicated Plaintiff's most severe Global Assessment Function ("GAF")[1] score in the year prior was

---

[1] The GAF scale is a numeric scale (0 through 100) used by mental health practitioners to rate social, occupational, and psychological functioning, with lower numbers representing more severe symptoms, difficulties, or impairments. A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association, DSM-IV-TR (2000). A GAF score between 41 and 50 describes "serious symptoms" or "any serious impairment in social, occupational, or school functioning." Garrison v. Colvin, 759 F.3d 995, 1002 n.4 (9th Cir. 2014). While an ALJ may consider GAF scores in considering a plaintiff's abilities, the ALJ need not accept or reject a GAF score. Vongphachanh v. Commissioner, 2018 WL 1363492, at *12 (E.D. Cal., Mar. 15, 2018).

45, and assigned a GAF score of 55 at the time of the assessment. (AR 510.) Dr. Fajerman prescribed supportive therapy and 150 milligrams of Wellbutrin ER, an antidepressant, and instructed Plaintiff to return in four weeks. (AR 510.)

Plaintiff saw Dr. Fajerman on nine occasions between February 23, 2012 and July 10, 2014. (AR 496-99, 508-13, 532, 534, 556-57.) The records generally indicate similar mental symptoms as on the first visit, at times with differing severities. On multiple occasions, Dr. Fajerman recorded that Plaintiff's compliance in taking his medication was "inconsistent" or "poor." (AR 497, 499, 532, 534.) Dr. Fajerman noted that Plaintiff needed "very specific reminders" for taking his medication, and also wrote he had to review proper use of medications with Plaintiff. (AR 532, 534.) On July 10, 2014, Dr. Fajerman reported that Plaintiff exhibited pressured and excessive speech, flat affect, anxious and labile mood, discouraged attitude, and poor judgment and insight. (AR 556-57.) Dr. Fajerman assigned a GAF score of 50, and Plaintiff's Wellbutrin ER dosage remained at 150 milligrams (one tablet per day in the morning). (AR 556-57.)

Dr. Fajerman completed two Psychiatric Review Forms in September 2012, and October 2014, providing his analysis of the severity of Plaintiff's mental limitations in work-related functioning. (AR 476, 551.) Both indicate Plaintiff suffered from sleep and mood disturbance; anhedonia or pervasive loss of interests; psychomotor agitation or retardation; feelings of guilt or worthlessness; difficulty thinking or concentrating; emotional withdrawal or isolation; blunt, flat, or inappropriate affect; decreased energy; decreased need for sleep; generalized persistent anxiety; and a poverty of content of speech. (AR 476, 551.) In 2014, Dr. Fajerman added that Plaintiff exhibited personality change; emotional lability; delusions or hallucinations; recurrent panic attacks; suicidal ideation; flight of ideas; oddities of thought, perception, speech or behavior; intrusive recollections of a traumatic experience; somatization unexplained by organic disturbance; easy distractibility; and a loosening of associations. (AR 551.) Dr. Fajerman listed

7

Plaintiff's medications as Wellbutrin ER 150 milligrams and Trazodone 200 milligrams. (AR 552.)

Both forms indicate Plaintiff was moderately impaired in carrying out simple one-to two-step job instructions, relating with coworkers and the public, and accepting instructions. (AR 479, 554.) Both indicate, with respect to work-related activities, that Plaintiff had marked limitations in performing complex tasks; maintaining concentration, persistence and pace; maintaining regular attendance in the workplace; consistently performing work activities; and performing work activities without needing additional supervision. (AR 479, 554.) Dr. Fajerman also found Plaintiff would have marked restrictions in activities of daily living; marked difficulties in social functioning; marked difficulties in maintaining concentration, persistence, or pace; and three repeated episodes of decompensation, each of extended duration. (AR 479, 554.) Dr. Fajerman assigned a current GAF score of 55 in the 2012 form, adding that the most severe score in the year prior was 50. (AR 476.) He found Plaintiff was "currently disabled due to his affective disorders and pathology." (AR 478.) In the 2014 form, Dr. Fajerman assigned a GAF score of 60, adding that the most severe score in the year prior was 60. (AR 551.) Dr. Fajerman gave a "guarded" prognosis in both forms, and noted Plaintiff's impairments or treatment would cause him to miss work three or more times per month. (AR 478, 553.)

### 2.     Dr. Nicholson (Examining Physician)

On August 14, 2012, Gregory M. Nicholson, M.D., a board certified psychiatrist, conducted a comprehensive psychiatric evaluation of Plaintiff. (AR 469-74.) Plaintiff's chief complaint was anxiety. (AR 469.) Plaintiff stated he had been in a car accident, was bothered by memories of it, and was scared to drive. (AR 470.) Dr. Nicholson diagnosed Anxiety Disorder, not otherwise specified, based on Plaintiff's history of a traumatic car accident and his current history of posttraumatic stress disorder symptoms. (AR 473.) He

8

also diagnosed Depressive Disorder, not otherwise specified, based upon Plaintiff history of depressed mood, dysphoric affect, and neurovegetative symptoms of depression. (AR 473.) Dr. Nicholson concluded Plaintiff had only mild mental limitations, assigned a GAF score of 55, and opined Plaintiff's condition would improve over the next twelve months with active treatment. (AR 473.)

### C. Function Reports

#### 1. Plaintiff's Function Reports

Plaintiff completed two Function Reports on June 18, 2012 and September 21, 2012. (AR 336-43, 367-74.) His friend, Magdalena Aguilar, who also completed separate Third Party Function Reports, assisted him with filling out the June 2012 form. (AR 343.) Plaintiff indicated he lived alone in his car, and his symptoms affected his sleep. (AR 336-37.) He noted he did not cook his own meals and did not do house or yard work other than laundry and occasional sweeping. (AR 338, 369.) He was able to maintain personal care, and would either walk or take public transportation every day to go food shopping. (AR 337, 339, 370.) He handled money and paid bills, but experienced stress when handling a checkbook or money orders. (AR 339, 370.) He listed his hobbies as watching television and reading books, but also noted he was no longer able to read. (AR 340.) He said his symptoms limited his ability to lift, squat, bend, stand, reach, walk, kneel, talk, hear, climb stairs, see, remember things, concentrate, understand, follow instructions, and get along with others. (AR 341.) He stated he could walk for fifteen minutes before needing a break, and could pay attention for up to thirty minutes. (AR 341.) He stated he could not finish things he started, had difficulty following written or oral instructions, and had been laid off in the past because of his concentration problems. (AR 341-42.) He indicated he woke up every day feeling confused, and did not handle stress well as it made him feel ill. (AR 367, 373.) Plaintiff noted he was able to think and

9

socialize before his symptoms worsened, but now experienced problems getting along with others. (AR 368, 372.)

### 2. Third Party Function Reports

Magdalena Aguilar, Plaintiff's friend, completed two Third Party Function Reports on June 19, 2012 and September 27, 2012. (AR 348-55, 376-83.) Ms. Aguilar said Plaintiff visited her about once per week, and occasionally attended church. (AR 352, 380.) She confirmed Plaintiff either walked or took public transportation daily to buy prepared food or frozen meals. (AR 350-51, 379.) Plaintiff handled money to buy food, and his poor vision and concentration prevented him from driving. (AR 351, 379.) She stated he had difficulty communicating with others, could not have fluent conversations, and had poor memory. (AR 353, 381.) Ms. Aguilar noted Plaintiff's disabilities limited his ability to work, and indicated Plaintiff had been fired in the past because of his problems getting along with other people. (AR 354.)

### III. THE ADMINISTRATIVE HEARING

#### A. Plaintiff's Testimony

At the initial hearing on April 7, 2014, Plaintiff, with the assistance of a Spanish interpreter, testified he could only see with his right eye, and had problems with the left side of his body. (AR 44.) He stated he had been blind in his left eye for the past 25 years, since his car accident. (AR 47-48.) The hearing was continued in order to hold the record open for records from Plaintiff's neurologist, with whom Plaintiff had an appointment later that month. (AR 45.) The second hearing, scheduled for August 19, 2014, did not proceed due to the absence of an interpreter. (AR 53.)

The main hearing and testimony took place before the ALJ on December 1, 2014. (AR 57.) Plaintiff's counsel did not submit any neurological records. (AR 59.) Plaintiff

10

testified he lived in a car on a man's property in San Ysidro. (AR 61.) He said he had worked in the past as a sweeper for NYA International, a floor waxer for Empire Maintenance Company, and as a cook for Tommy's Hamburgers and Jody Marconi Hotdogs. (AR 60-61, 84-85.) He cooked and cleaned in the kitchen, did not man the cash register, and could not remember whether he ever took customer orders. (AR 84-85, 87.) Plaintiff also worked at a factory where he stood and filled medicine supplement bottles by hand, but was eventually fired for poor performance. (AR 68.) Plaintiff occasionally washed cars and watered plants for the owner of the property on which he lived. (AR 61, 68.) Plaintiff stated the last time he worked was as a sweeper about two to three months before the hearing. (AR 60.)

Plaintiff testified he regularly saw Dr. Cevallos at the San Ysidro Health Center. (AR 62.) He also testified that he saw Dr. Fajerman every two or three months and though his medication helped, it did not help enough him sufficiently to feel well enough to work. (AR 62-63.) He said the primary reason he was unable to work was chronic pressure and numbness on his left side. (AR 63.) He also mentioned he felt depressed and that his "mind [was] lost." (AR 64.) He said although he wanted to think and talk, he could not. (AR 64.) He reported trouble sleeping, stated his concentration and memory were poor, and explained that going out in public gave him anxiety, which made him feel angry and frustrated. (AR 64.) Plaintiff testified he went out daily to shop for frozen food, which he cooked in a microwave. (AR 64-65.) He stated little jobs like washing cars made his pain worse. (AR 65.) He said he could sit for 5 to 15 minutes and walk for 15 to 30 minutes before he felt pain, which he described as "chronic pain from my whole spine." (AR 65, 69.) Plaintiff testified he was blind in his left eye and, despite using inhalers every day, felt out of breath all the time. (AR 66.) His current medications included Bupropion HCL XL 150 mg (generic for Wellbutrin) (1 tablet every morning); Trazodone 100 mg (2 tablets at bedtime); Gabapentin 600 mg (generic for Neurontin) (1

11

tablet twice per day); Temazepam 30 mg (1 capsule at bedtime); Tramadol HcL 50mg (2 tablets twice per day); Omeprazole DR 20 mg (1 capsule per day); Prednisone 10 mg (1 tablet per day); Montelukast Sodium (Singulair) 10 mg (1 tablet per day); Fluticasone Propionate (nasal spray); Symbicort (inhaler); Beclomethasone Dipropionate (inhaler); and Proair HFA 90 mcg (inhaler). (AR 69-70, 409.)

### B. Medical Expert Testimony

Dr. Jonas, the medical expert ("ME"), testified at the hearing regarding the interplay between Plaintiff's physical conditions and psychiatric conditions. (AR 67, 73.) Dr. Jonas testified there were "no objective indicators" suggesting Plaintiff had significant back disease, and observed that x-rays of Plaintiff's back showed only minor degenerative findings. (AR 73-74.) Therefore, he found Dr. Cevallos's assessment in April 2014 that Plaintiff was essentially sedentary, i.e., that Plaintiff was limited to lifting less than ten pounds, sitting for less than six hours per day, and standing and walking for less than two hours a day, to not be reasonable. (AR 73-74.)

Dr. Jonas also questioned the severity of Plaintiff's anxiety and depression conditions. (AR 74.) He noted Dr. Fajerman's prescription of Wellbutrin was modest, constituting about a third of the maximum dosage. (AR 74-75.) Dr. Jonas stated the record did not address why the dosage was low, and he questioned why the treatment was not more aggressive if the doctor was confident in his diagnosis or believed the diagnosis to be functionally impairing, as set forth in the Psychiatric Review Form completed in 2012. (AR 74-75, citing AR 476-80.) Dr. Jonas speculated that Dr. Fajerman either believed that dosage effectively controlled Plaintiff's depression, or that an increase in the dosage would cause side effects, requiring a shift to another antidepressant. (AR 75-76.) As there is nothing in the record indicating any of this, Dr. Jonas stated "we're sort of stuck," as a physician's normal approach would be to choose an antidepressant,

12

prescribe as much as necessary to solve the problem, and if the maximum dosage is reached without solving the problem, switch to or add another medication. (AR 76, 80.)

Dr. Jonas further testified that neither Plaintiff's depression nor anxiety met the requirements of Listings 12.04 and 12.06, respectively, because Plaintiff had only no to mild impairment in his activities of daily living, relating to his lack of driving; a mild to moderate impairment in social functioning; at most a mild impairment in concentration, persistence and pace as demonstrated during Plaintiff's comprehensive psychiatric evaluation, when he could remember only two to three test words after a few minutes; and no evidence of decompensation. (AR 76-78.) Dr. Jonas concluded Plaintiff would not likely do well in "an unrestricted way with the broad general public." (AR 78.)

### C. Vocational Expert Testimony

Vocational expert ("VE") John P. Kilcher testified. (AR 83, 246.) The VE classified Plaintiff's prior positions as short order cook, light and semi-skilled, and cleaner, medium and unskilled. (AR 86.) The ALJ presented the VE with a hypothetical scenario of a younger individual with less than a high school education who could read, write, and speak English. (AR 86.) The ALJ explained the hypothetical person had monocular vision and was limited to light work, limited public contact, and simple repetitive tasks. (AR 86-87.) The VE testified such an individual would be unable to perform Plaintiff's prior work. (AR 87.) This hypothetical individual, however, would be able to work as a stock checker or laundry folder, both of which are light and unskilled. (AR 88.) The VE stated a person could miss one day per month and still maintain these jobs, but if the person was off-task about twenty percent of the time, the person would not be able to maintain this work. (AR 88.)

13

## IV.  THE ALJ DECISION

After considering the record, the ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since April 24, 2012, the application date [citation omitted].

2.      The claimant has the following severe impairments: left-side body pains, status-post motor vehicle accident; left-eye blindness; COPD; allergic rhinitis; insomnia; sleep apnea; anxiety; and depression [citation omitted].

. . . .

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in [the Social Security Regulations].

. . . .

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently; the claimant can sit for 6 hours in an 8-hour workday with normal breaks; the claimant can stand and/or walk for 6 hours in an 8-hour workday with normal breaks; the claimant can perform simple repetitive tasks; the claimant can have limited contact with the public; and the claimant has monocular vision.[2]

. . . .

5.      The claimant is unable to perform any past relevant work [citation omitted].

---

[2] In other words, the ALJ found Plaintiff had the residual functional capacity to perform light work, but not the full range of light work. Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." Id. A person able to do light work is also able to perform sedentary work. Id.

14

. . . .

6.     The claimant was born on December 13, 1965 and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed [citations omitted].

7.     The claimant has a limited education and is able to communicate in English [citations omitted].

8.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills [citations omitted].

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform [citations omitted].

. . . .

10.     The claimant has not been under a disability, as defined in the Social Security Act, since April 24, 2012, the date the application was filed [citation omitted].

(AR 26-33.)

## V.     STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show: (1) He or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C. § 423(d)(1)(A),

15

(2)(A).  An applicant must meet both requirements to be "disabled." Id. Further, the applicant bears the burden of proving he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

## A.    Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are as follows: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled. If not, the claimant's residual functional capacity ("RFC") is assessed and the evaluation proceeds to step four. (4) Whether the claimant is able to do any work (s)he has done in the past. If so, the claimant is not disabled. If not, the evaluation continues to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy the claimant can do, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4); see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999). The claimant's RFC is used at both step four and step five. 20 C.F.R. § 404.1520(a)(4). RFC is "the most [one] can still do despite [one's] limitations." 20 C.F.R. § 404.1545(a)(1). The evidence used to assess RFC includes all relevant medical and other evidence, the individual's statements, and descriptions and observations of the individual's limitations provided by the individual and other persons. 20 C.F.R. § 404.1545(a)(3).

16

## B. Judicial Review

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless: (1) The ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000); Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009) (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g). The matter may also be remanded to the SSA for further proceedings. Id.

## VI. DISCUSSION

Plaintiff argues the ALJ erred in his decision to deny Plaintiff SSI benefits in three respects. First, Plaintiff argues the ALJ improperly evaluated his credibility. (Pl.'s Mot. at

17

19-21.)[3] Second, Plaintiff argues the ALJ improperly discredited Dr. Fajerman's opinions. (Id. at 21-25.) Third, Plaintiff contends the ALJ improperly discredited Magdalena Aguilar's third party testimony. (Id. at 25-26.)

### A. The ALJ Improperly Discredited Plaintiff's Subjective Symptom Testimony

An ALJ engages in a two-step analysis to determine the extent to which a claimant's report of his symptoms must be credited. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. Garrison, 759 F.3d at 1014 (citations and quotations omitted). At step two, the ALJ must evaluate the intensity and persistence of the claimant's symptoms, such as pain, and determine the extent to which the symptoms limit his ability to perform work-related activities. "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear and convincing reasons for doing so." Id. at 1014-15 (citations and quotations omitted).

Here, at step one of the two-step process, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," and did not make a finding of malingering. (AR 29.) At the second step, the ALJ concluded Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (AR 29.)[4] He set forth the

---

[3] Pages cited to in the parties' briefs reflect the page number affixed by the electronic case filing system.
[4] At the time of the ALJ's decision, Social Security Ruling ("SSR") 96-7p provided that evaluation of a claimant's symptoms "requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects . . . ." SSR 96-7p, 1996 WL 374186 (1996). In March 2016,

18

following reasons for his finding: (1) Plaintiff's daily activities undermined his allegations of disabling functional limitations; (2) the objective medical evidence reflected mild findings and did not support Plaintiff's allegations; (3) Plaintiff did not receive medical care following his car accident in 1985; (4) Plaintiff had not been fully compliant with his treatment; and (5) Plaintiff received only conservative treatment. (AR 28-30.)

### 1. Plaintiff's Daily Activities

The ALJ stated Plaintiff's ability to participate in daily activities "undermines the credibility of his allegations of disabling functional limitations" because "[s]ome of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment." (AR 28-29.) It is proper for an ALJ to consider the claimant's daily activities in making his credibility determination. See, e.g., Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also 20 C.F.R. § 404.1529(c)(3)(i) (claimant's daily activities relevant to evaluating symptoms). "One does not need to be 'utterly incapacitated' in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)). Only if a claimant's level of activities is inconsistent with his claimed limitations would activities of daily living have any bearing on the claimant's credibility. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).

Here, the ALJ found Plaintiff's ability to shop for frozen food, use a microwave to prepare that food, maintain personal care, and occasionally wash cars and water plants

---

SSR 96-7p was superseded by SSR 16-3p to "eliminat[e] the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term" and to "clarify that subjective symptom evaluation is not an examination of an individual's character" but instead should be consistent with the SSA's regulatory language regarding symptom evaluation. SSR 16-3p, 2017 WL 5180304 (2017). SSR 16-3 became applicable on March 28, 2016, after the ALJ's decision in this matter. Id.

19

16-CV-2424 W (JMA)

contradicted Plaintiff's allegations. (AR 28.) The Court disagrees. These daily activities are not inconsistent with Plaintiff's allegations, and the physical functions they require are not necessarily transferable to the work setting. Fair, 885 F.2d at 603 ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it may be impossible to periodically rest or take medication."). An easily distractible Plaintiff, who experiences chronic pain and mobility issues that are exacerbated by activity, may be rendered unable to work full-time, but still may be able to manage simple and short daily tasks like watering plants, buying food, and using a microwave.

Further, the ALJ ignored other evidence showing the difficulties Plaintiff faced in daily life, including Plaintiff's difficulty paying attention (AR 476, 503, 551); inability to follow through on activities (AR 341); difficulty following written or oral instructions (AR 541); being fired in the past because of concentration problems (AR 342); difficulty remembering things on a daily basis (AR 503); anxiety regarding, and aversion to, social situations (AR 64); frustration from the anxiety he experiences when going into public (AR 64); forgetting to take medication (AR 532); trouble adapting to a new routine (AR 342); trouble handling stress and stress making him feel ill (AR 342, 367, 373); pain exacerbated by activity (AR 440); his inability to socialize with others (AR 368, 372); and the increased difficulty performing small jobs like washing cars or watering plants because his pain has gotten more severe. (AR 65.) See Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (providing that an ALJ cannot justify a credibility finding "by ignoring competent evidence in the record that suggests an opposite result"). That Plaintiff could participate in some daily activities does not contradict the evidence of otherwise severe problems he encountered every day during the relevant period. Diedrich v. Berryhill, 874 F.3d 634, 642-43 (9th Cir. 2017) (finding legal error when an ALJ discredited the plaintiff based on her daily activity—maintaining personal care, caring for

20

her cat, performing house chores, shopping, paying bills, and using a checkbook—when the ALJ ignored other evidence of the plaintiff's daily limitations); see also Gallant, 753 F.2d at 1453 (ordering award of benefits for constant back pain and leg pain despite claimant's ability to cook meals and wash dishes). Plaintiff's daily activities do not constitute a clear and convincing reason supported by substantial evidence in the record to discredit his report of symptoms.

### 2. Objective Medical Evidence

Although an ALJ may not disregard a claimant's testimony "*solely* because it is not substantiated affirmatively by objective medical evidence" (see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) (emphasis added)), the ALJ may consider whether the alleged symptoms are consistent with the medical evidence as one factor in his evaluation. See Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007); see also Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis.").

In this case, the ALJ referred to medical evidence in the record to discredit Plaintiff's symptom testimony, including the cervical and thoracic spine x-rays indicating "mild" findings, the sleep study showing Plaintiff's mild sleep apnea improved with treatment, and Dr. Fajerman's medical report dated July 10, 2014, indicating Plaintiff showed no signs of mania or psychosis, had no trouble with his appearance, appeared fully oriented, had unremarkable behavior, and had intact memory. (AR 29-30, citing AR 556-57.) The ALJ, however, cannot "cherry-pick" certain portions of medical evidence found in the record to support an adverse credibility finding when there is other contradicting evidence in the record suggesting the opposite. See Gallant, 753 F.2d at 1456; see also AR 426-27, 430, 431, 433-42, 487-89, 497-99, 503, 511, 535, 556-57

21

(contradicting evidence in the record). Mild x-ray findings of Plaintiff's spine do not necessarily contradict Plaintiff's allegations regarding the severity of the pain he experiences on the *entire left side* of his body, and these x-rays are not dispositive of the credibility of Plaintiff's mental impairment allegations. <u>Trevizo v. Berryhill</u>, 871 F.3d 664, 676 (9th Cir. 2017) (stating ALJ's reliance on the "mildness of [plaintiff's] thoracic degenerative disc disease" was not a specific and legitimate reason to discredit a treating physician's opinion). Moreover, there is no discussion by the ALJ of a potentially significant objective finding in the record: an MRI of Plaintiff's thoracic spine showing a disk bulge at T7-8. (AR 430.) And, while the sleep study reflects Plaintiff's sleeping and breathing symptoms improved with treatment, that has little bearing on the credibility of Plaintiff's claims about the severity of his pain, numbness, and restricted movement, nor on Plaintiff's confusion, concentration, and memory problems. In sum, the Court does not find the objective medical evidence constitutes a clear and convincing reason to discredit Plaintiff's subjective symptoms.

### 3. Lack of Medical Treatment After Car Accident

The ALJ noted, "[Plaintiff] was in a car accident, in 1985, for which he did not receive medical care and afterwards complained of . . . medical problems" including "depression, inability to sleep, chronic back pain, and blurry vision in his left eye." (AR 29.) "[U]nexplained, or inadequately explain[ed], failure to seek treatment or follow a prescribed course of treatment" may be relevant evidence for the ALJ's credibility determination. <u>Fair</u>, 885 F.2d at 603. In this case, it appears the ALJ is suggesting Plaintiff's symptoms were of a disabling severity immediately following the accident. This is not reflected by the record, however. Plaintiff admitted in his intake assessment with San Ysidro Health Center that his physical problems began following the accident, but the intake assessment also says Plaintiff "now . . . experiences pain on the left side of

22

his body." (AR 503.) In his function report, Plaintiff said "he was able to think and socialize before his symptoms worsened, but now he has social problems with everyone." (AR 368, 372.) Plaintiff testified the pain has worsened over time and has made it harder to perform small tasks like washing cars. (AR 65.) Plaintiff alleges the onset of his disability began on January 1, 2012 (AR 24) and he first began seeing Dr. Cevallos on May 18, 2011 (AR 444). Plaintiff also testified he could not remember when he became blind in his left eye, only that it had happened recently. (AR 86.) The record contradicts the ALJ's argument that Plaintiff failed to seek treatment once he became disabled; therefore this is not a clear and convincing reason supported by substantial evidence in the record to discredit Plaintiff's testimony. It is apparent from the record that Plaintiff sought treatment with the onset of the increasing severity of his pain, vision loss, and mental deterioration. (AR 503.)

### 4.    Non-Compliance with Treatment

The ALJ found Plaintiff's inconsistent compliance with taking his medicine also warranted an adverse credibility finding. (AR 31.) Plaintiff contends the ALJ erred because he was required to consider Plaintiff's mental limitations in relation to his treatment compliance. (Pl.'s Reply at 6.) Although, as set forth above, the ALJ may rely on the failure to follow a prescribed course of treatment to discount the severity of a claimant's symptoms, a claimant's mental limitations should be considered when determining if he had an acceptable reason for failing to follow prescribed treatment. See 20 C.F.R. § 404.1530(c).

Here, the ALJ concluded Plaintiff's inconsistent compliance with his medication regimen undermined the credibility of Plaintiff's allegations, but he did not consider Plaintiff's mental limitations as a potential reason for his failure to consistently follow the treatment. (AR 31.) Plaintiff often exhibited poor memory, insight, and judgment. See AR

23

503-06, 511, 551, 553, 556-57. Dr. Fajerman noted that Plaintiff required "very specific reminders re use of meds," and he had to review "proper use of medications" with Plaintiff. (AR 532, 534.) Plaintiff's inconsistent compliance may well have been a product of his mental problems. See Sunwall v. Colvin, 158 F. Supp. 3d 1077, 1082 (D. Or. 2016) (finding bipolar Plaintiff's "poor judgment generally—and his inconsistent compliance with medications specifically—is a manifestation of his mental illness."). The ALJ erred by failing to consider Plaintiff's mental limitations in relation to the inconsistent compliance before finding that inconsistency contradicted Plaintiff's credibility. Thus, Plaintiff's lack of full compliance with treatment does not constitute a clear and convincing reason to find Plaintiff's credibility suspect. See Garrison, 759 F.3d at 1018 n.24 ("[W]e do not punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view such departures from prescribed treatment as part of claimant's underlying mental afflictions.").

### 5. Conservative Treatment

The ALJ cites to the "low dosage" of Wellbutrin prescribed to Plaintiff by Dr. Fajerman to support his adverse credibility finding. (AR 29-30.) In doing so, the ALJ relied on the ME's testimony that the Wellbutrin dosage was only one-third of the maximum dosage, which was unexplained by Plaintiff's treating doctor. (AR 31.)

An ALJ may use evidence of "conservative care" to discount testimony regarding the severity of an impairment. See Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007). Here, the ME could only speculate regarding the unexplained low dosage of Wellbutrin, and admitted he did not know why the dosage level was low. (AR 75, 80-81.) The ALJ then used this testimony as a reason for discrediting the Plaintiff's allegations. (AR 31.) However, the ALJ did not know why the dosage remained low, because the ME did not know why. (AR 75.) The ALJ, therefore, did not know whether the reason the dosage

24

remained low was one contradictory to Plaintiff's allegations or credibility. This does not constitute a clear and convincing reason supported by substantial evidence to discredit Plaintiff. Lester, 81 F.3d at 831 (noting the opinion of a non-examining physician by itself is not "substantial evidence"). As Plaintiff contends, when the evidence is ambiguous, the ALJ has a duty to conduct an inquiry, particularly when the claimant is mentally impaired and unable to protect his own interests. Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). Here, because the ALJ relied in significant part on Plaintiff's Wellbutrin dosage, it would have been helpful to have an understanding of why Dr. Fajerman prescribed Wellbutrin as he did. The ALJ could have discharged his duty to further develop the record by submitting questions to Dr. Fajerman, subpoenaing him, or leaving the record open after the hearing to allow supplementation of the record. Id.

**B.    The ALJ Improperly Discredited Treating Psychiatrist Dr. Fajerman's Opinion**

In disability benefits cases, "physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability—the claimant's ability to perform work." Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998). There are three categories of physicians in disability cases: (1) treating physicians, (2) examining physicians who examine, but do not treat the claimant, and (3) non-examining physicians who neither examine nor treat the claimant. Lester, 81 F.3d at 830. Generally, the opinions of the treating physicians are given controlling weight when supported by medically acceptable diagnostic techniques and when consistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. A treating physician's opinion is typically entitled to greater weight than that of an examining physician, and an examining physician's opinion is entitled to greater weight than that of a non-examining physician. Ryan v. Commissioner of Soc. Sec., 528 F.3d 1194, 1198

(9th Cir. 2008). The weight given a non-examining physician's testimony "depends on the degree to which he provides supporting explanations for his opinions." Id. (citing § 404.1527(d)(3)).

When a treating physician's opinion in the record is contradicted by another doctor's opinion, the ALJ must provide "specific and legitimate reasons that are supported by substantial evidence" for discrediting or rejecting the opinion. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005). The ALJ can meet the "substantial evidence" requirement by providing a "detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Garrison, 759 F.3d at 1012 (quotations and citation omitted). The opinions of non-examining medical advisors can constitute substantial evidence when they are supported by and consistent with other evidence in the record. Morgan v. Comm'r of Soc. Sec. Admin, 169 F.3d 595, 600 (9th Cir. 1999) (citing Andrews, 53 F.3d at 1041).

Dr. Fajerman's opinion that Plaintiff had disabling mental limitations precluding him from working was contradicted by both non-examining physician Dr. Jonas, who testified Plaintiff has only mild limitations (AR 77-78), and examining physician Dr. Nicholson, who also opined he had no more than mild mental limitations. (AR 473-44.) Because Dr. Fajerman's opinions were contradicted by the other doctors' opinions, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for discrediting him. Bayliss, 427 F.3d at 1216. The ALJ assigned "less weight" to Dr. Fajerman's assessment that Plaintiff had moderate to serious mental symptoms, and moderate to marked limitations in work-related functioning, as he found the opinions were not supported by the objective treatment records. (AR 31.) Specifically, the ALJ referenced Dr. Fajerman's progress note from June 2013, indicating "inconsistent" treatment compliance; the modest prescription of Plaintiff's psychotropic medicine, Wellbutrin; and Dr. Fajerman's finding that Plaintiff's GAF score was 60 within the prior

26

year, indicating no more than moderate mental symptoms. (AR 31, citing AR 532, 556, 551.) Plaintiff contends these are not specific and legitimate reasons supported by substantial evidence warranting a rejection of Dr. Fajerman's opinions. (Pl.'s Mot. at 21-25.)

The Court agrees. First, as previously discussed, the ALJ concluded Plaintiff's inconsistent treatment compliance contradicted Dr. Fajerman's opinions, but the ALJ never considered or inquired about Plaintiff's mental limitations as a potential reason for the failure to take his medicine consistently. Plaintiff's poor memory, insight and judgment may have been the culprit for failing to comply, which may actually support, rather than contradict, Dr. Fajerman's opinions. (AR 511, 556-57.) Because Plaintiff's inconsistent compliance could have been a manifestation of his mental limitations, the Court cannot consider Plaintiff's inconsistent treatment compliance a specific and legitimate reason to discredit Dr. Fajerman. See, e.g., Sunwall, 158 F. Supp. 3d at 1082; Garrison, 759 F.3d at 1018 n.24 (9th Cir. 2014). Next, as discussed above, the reason behind Plaintiff's allegedly low Wellbutrin dosages is ambiguous and was not developed in the record. As this was not a clear and convincing reason to find Plaintiff's credibility suspect, it is also not a specific and legitimate reason to reject Dr. Fajerman's opinions.

The ALJ observed, "Dr. Fajerman also reported the claimant's GAF score was 60 within the past year, indicating no more than moderate mental symptoms." (AR 31.) However, earlier in his decision, the ALJ himself noted, "Often times, GAF scores are subjectively assessed scores that reveal only snapshots of impaired and improved behavior." (AR 31.) Mental illness cases are known for changes in improvement and severity of debilitating symptoms, and an ALJ cannot isolate a specific instance of improvement as a reason for concluding a Plaintiff is not disabled. Brock v. Berryhill, 2017 WL 3888303 (9th Cir. 2017) (quoting Garrison, 759 F.3d at 1017 ("[I]t is error for an ALJ to pick out a few isolated instances of improvement over a period of months or

27

years and to treat them as a basis for concluding a claimant is capable of working")). Mental health treatment notes must be interpreted with an "awareness that improved functioning while being treated and while limiting environmental stressors does not always mean the claimant can function effectively in the workplace." Garrison, 759 F.3d at 1017. Moreover, GAF scores are unreliable indicators of a claimant's ability to perform sustained work, as they are "merely a snapshot in time" that may or may not be supported by the overall medical record. Mann v. Astrue, 2009 WL 2246350, at *2 (C.D. Cal. Jan. 24, 2009). GAF scores are created in a controlled clinical setting not necessarily comparable to a workplace environment (Garrison, 759 F.3d at 995 n.4), and courts have held that GAF scores are not dispositive of the question of whether a person is disabled. See, e.g., Marcias v. Colvin, 2016 WL 1224067, at *8 (E.D. Cal. Mar. 29, 2016). Here, the record shows Plaintiff's GAF scores ranged from 45 (the most severe score in the year prior to the date when Plaintiff first saw Dr. Fajerman) to a score of 60. (AR 510, 556-57.) This suggests Plaintiff experienced moderate to severe mental impairments in social or occupational functioning. Garrison, 759 F.3d at 995 n.4. Due to the unreliability of GAF scores, and the conflicting severity of the scores contained in the record, the Court does not find Plaintiff's GAF score of 60 to be a specific and legitimate reason to discount Dr. Fajerman's opinion regarding Plaintiff's mental limitations.

Furthermore, and importantly, the ALJ did not consider Plaintiff's relationship with Dr. Fajerman before discrediting his opinion and assigning "great weight" to the opinion of non-examining physician Dr. Jonas. When deciding how much weight to give a medical opinion, ALJs must consider factors including the length of the treating relationship, the frequency of examination, the nature and extent of the treating relationship, and the supportability of the opinion. 20 C.F.R. § 404.1527(c)(2)-(6). Here, the ALJ failed to consider the nature and extent of the relationship Plaintiff had with Dr. Fajerman, the frequency of the examinations, or the supportability of the opinion. This

28

failure alone "constitutes reversible legal error." <u>Trevizo</u>, 871 F.3d at 676; <u>see</u> <u>also</u> <u>Heun-Davidson v. Berryhill</u>, 2017 WL 5054657, at *7 (C.D. Cal. Nov. 1, 2017) (applying <u>Trevizo</u> and finding error in ALJ's failure to consider the relationship between the discredited treating physician and the plaintiff).

## C.  Third-Party Function Reports

In the Ninth Circuit, "the ALJ is required to account for all lay witness testimony in the discussion of his or her findings." <u>Robbins</u>, 466 F.3d at 885 (citing <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.")). "[L]ay witness testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence . . . and therefore *cannot* be disregarded without comment." <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis in original). "[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." <u>Stout v. Commissioner</u>, 454 F.3d 1050, 1056 (9th Cir. 2006).

Here, the ALJ found the statements made in Magdalena Aguilar's third-party function reports to be "only partially credible" because her statements were not given under oath, she is not a medical professional, and her statements were not supported by the medical evidence in the record. (AR 29.) The ALJ also observed that notwithstanding her report that Plaintiff had problems with lifting, squatting, standing, reaching, walking, talking, hearing, remembering, understanding, and getting along with others, Ms. Aguilar also "acknowledged the claimant was able to manage his personal care needs; prepare

29

frozen foods; do laundry; walk and use public transportation; and shop in stores." As the Court discussed above, Plaintiff's ability to conduct simple daily activities is not inconsistent with the alleged severity of his symptoms. Additionally, an ALJ cannot disregard a lay witness's testimony simply because it was not provided under oath by a non-medical professional. See Dallas v. Commissioner of Soc. Sec. Admin., 2017 WL 4242028, at *5 (D. Ariz. Sept. 25, 2017) (erroneously rejecting Third-Party Function Report because it was not under oath, the witness was not a professional, and the report "was inconsistent with the medical record."); see also Diedrich, 874 F.3d at 640 ("A lack of support from medical records is not a germane reason to give 'little weight' to [a lay witness's] observations.")  Accordingly, the ALJ failed to provide reasons germane to Ms. Aguilar for discrediting her statements regarding Plaintiff's limitations.

## VII.  REMAND

Remand is warranted when additional administrative proceedings can remedy defects in the original decision. Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981). Here, the ALJ erred by not properly evaluating Plaintiff's subjective symptom testimony; by not properly assessing the opinions of Plaintiff's treating psychiatrist, Dr. Fajerman, including not ascertaining the reason why Plaintiff was provided a "low" dosage of Wellbutrin; and by failing to properly consider the lay witness testimony of Plaintiff's friend, Ms. Aguilar. The Court will therefore remand this case in order for the ALJ to provide due consideration to the above.

16-CV-2424 W (JMA)

## VIII. CONCLUSION & ORDER

For the reasons set forth above, Plaintiff's motion for summary judgment is **GRANTED**. [Doc. 12.]

Defendant's motion for summary judgment is **DENIED**. [Doc. 13.]

This case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion. Upon remand, the Clerk shall close the district court case file.


**IT IS SO ORDERED.**

Dated: March 28, 2018

Hon. Thomas J. Whelan
United States District Judge